**NATIONAL CITY BANK, Trustee, Plaintiff,**

v.

**de LAVILLE et al., Appellees and Cross–Appellants;**
**Ballas, Appellant and Cross–Appellee.**

[Cite as *Natl. City Bank v. de Laville,* 170 Ohio App.3d 317, 2006-Ohio-5909.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–05–1384.

Decided Nov. 9, 2006.

Thomas P. Dillon, David F. Waterman, and William H Gosline, for appellees and cross-appellants.

Dianne Foley and J. Donald Cairns, for appellant and cross-appellee.

GLASSER, Judge.

{¶ 1} This is an appeal of a ruling by the Lucas County Court of Common Pleas, Probate Division, granting summary judgment in a declaratory judgment action filed by plaintiff, National City Bank. For the reasons that follow, we affirm in part and reverse in part the trial court's ruling.

{¶ 2} George Ballas and his former wife Ann T. Ballas had three children, defendants-appellees and cross-appellants Stefani de Laville, Martina A. Nimphie, and Peter Ballas II, M.D. ("the Ballas children"). The couple eventually divorced and, in 1997, George married defendant-appellant and cross-appellee, Marianne Robinson. George died on December 26, 2002.

{¶ 3} In 1996 and 1997, George made multiple changes to his estate plan with the assistance of his attorneys at Eastman & Smith, particularly with his long-time attorney, Morton Bobowick. In 1996, George amended his trust three times: in May, July, and November. The different versions reflect various allocations of trust property among the Ballas children. Bobowick explained at deposition the reason for the multiple versions, stating, "[George's] children were giving him a great deal of grief over his divorce from their mother, from Ann, and his relationship and upcoming marriage to Marianne and he was not happy with some of their behavior; and, therefore, he was making changes, you know, as the situation changed." In none of these amended trusts did George alter the provisions related to Ann and Marianne. He expressly provided that Ann would receive nothing and that Marianne would be a beneficiary of a trust funded with one-third of his trust property.

{¶ 4} On January 23, 1997, George and Marianne entered into an antenuptial agreement. George signed the document both in his individual capacity and in his capacity as trustee of the amended trust. Consistent with the 1996 versions of George's trust, the antenuptial agreement provided that upon George's death, Marianne would be a beneficiary of a trust funded with one-third of his trust property.

{¶ 5} On August 1, 1997, George again amended his trust. George directed his lawyers to prepare a trust that would "mirror" the antenuptial agreement and would provide Marianne, upon his death, with one-third of his property. Under the terms of the resultant trust document, Marianne was to receive all of the income from the marital trust A and, upon the satisfaction of certain conditions, payments of marital trust principal. Upon Marianne's death, 80 percent of the remainder of the marital trust A was to pass to the Ballas children. In addition to the remainder of the marital trust A, the trust established a residuary or family trust B for the benefit of the Ballas children.

{¶ 6} Prior to executing the August 1, 1997 trust, George videotaped a statement setting forth his intentions regarding the distribution of his property upon his death. Throughout the statement, George reiterated that he intended to give Marianne one-third of his property. According to testimony by attorney Bobowick, the trust document was drafted so as to fulfill that intention.

{¶ 7} George amended his trust on two subsequent occasions: in January 1999 and November 2001. Those amendments have no effect on the issues before the court.

{¶ 8} Plaintiff, National City Bank, is the successor trustee to the amended trust. The bank is also a successor to George as trustee in connection with and as a party to the antenuptial agreement.

{¶ 9} On June 22, 2004, the bank filed its complaint for declaratory judgment, seeking construction of the trust. Count 1 sought a construction of the trust regarding the appropriate allocation of estate taxes affecting the marital trust A and the residuary, or Ballas children's, trust B. Count 2 sought a construction of the trust regarding the meaning of the phrase "net federal estate tax value of Grantor's residence." Count 3 sought a construction of the trust and the antenuptial agreement regarding the trustee's consideration of Marianne's assets in determining principal distributions. Finally, Count 4 sought a construction of the trust and antenuptial agreement regarding the percentage of the trust property that Marianne can require the trustee to invest in fixed-income securities.

{¶ 10} After issues were joined and discovery was conducted in the case, the trial court directed the parties to file dispositive motions as to all issues. Marianne filed her motion for summary judgment on September 6, 2005. The Ballas children filed their cross-motion for summary judgment on the same date.

{¶ 11} On November 3, 2005, the probate court entered a judgment granting in part and denying in part the Ballas children's motion for summary judgment and granting in part and denying in part Marianne's motion for summary judgment.

The court's judgment entry was accompanied by an opinion that set forth the following rulings:

{¶ 12} 1. The marital trust A and the Ballas children's trust B should be funded after the payment of taxes.

{¶ 13} 2. One-half of the value of the Ballas residence should be excluded in the marital trust funding formula.

{¶ 14} 3. The trustee may, but is not required to, consider other sources of income before making payments of principal.

{¶ 15} 4. The trustee is required under the terms of the antenuptial agreement to allocate 60 percent of the marital trust assets to fixed-income securities.

{¶ 16} Both Marianne and the Ballas children timely appealed the trial court's judgment. Marianne raises the following assignments of error:

{¶ 17} I. "The trial court erred when it ruled that marital trust A must be reduced by estate taxes.

{¶ 18} II. "The trial court erred when it ruled that the trustee may, but is not required to, consider the surviving spouse and beneficiary Marianne Ballas's other assets and income when determining whether to make payments from principal.

{¶ 19} III. "The trial court erred when it ruled that the trustee is required, without any written direction from the surviving spouse and beneficiary Marianne Ballas, to invest 60% of the trust assets in fixed income investments."

{¶ 20} The Ballas children also raise three assignments of error:

{¶ 21} I. "The trial court erred in declaring that the proper funding formula for trust A requires the trustee to deduct only one-half of the value of the grantor's primary residence.

{¶ 22} II. "The trial court erred in declaring that the trustee is not required to consider the financial circumstances of appellant before making distributions of principal.

{¶ 23} III. "The trial court erred in declaring that the trustee is required to allocate 60% of the assets of marital trust A to fixed income securities."

{¶ 24} We note at the outset that an appellate court reviewing a trial court's granting of summary judgment does so de novo, applying the same standard as that used by the trial court. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. Civ.R. 56(C) provides:

{¶ 25} "Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule."

{¶ 26} Summary judgment is proper if (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) when the evidence is viewed most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, a conclusion adverse to the nonmoving party. *Ryberg v. Allstate Ins. Co.* (July 12, 2001), 10th Dist. No. 00AP–1243, 2001 WL 777121, citing *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 629, 605 N.E.2d 936.

{¶ 27} The moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of fact as to an essential element of one or more of the nonmoving party's claims. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264. Once this burden has been satisfied, the nonmoving party has the burden, as set forth at Civ.R. 56(E), to offer specific facts showing a genuine issue for trial. Id.

{¶ 28} A fundamental tenet for the construction of a trust is to ascertain, within the bounds of the law, the intent of the grantor. *Domo v. McCarthy* (1993), 66 Ohio St.3d 312, 314, 612 N.E.2d 706. In general, when the language of the instrument is unambiguous, a grantor's intent can be ascertained from the express terms of the trust itself. Id. But when ambiguity exists or the grantor's intent is unclear, a court may consider extrinsic evidence to determine the grantor's intent. *McDonald & Co. Secs., Inc., Gradison Div. v. Alzheimer's Disease & Related Disorders Assn., Inc.* (2000), 140 Ohio App.3d 358, 363, 747 N.E.2d 843. The question of whether language in a trust document is ambiguous is an issue of law that an appellate court will review de novo. Id.

{¶ 29} We note in this case that in addition to the trust document, there is an antenuptial agreement that although not specifically incorporated by reference in the trust document, directly addresses aspects of the trust and its terms and provides detailed guidance as to George and Marianne's agreement regarding distribution of the trust assets. As indicated above, National City Bank is both successor trustee to the amended trust and a successor to George as trustee in connection with and as a party to the antenuptial agreement. Thus, the documents in question each demonstrate not just the reflective and complementary nature of their terms, but also their binding effect upon the bank to ensure the proper distribution and handling of assets, both under the trust and in accordance with the antenuptial agreement. Based on the foregoing (together with the additional fact that the trust agreement contains no integration clause), we

conclude that the trust document and antenuptial agreement are properly construed together in determining this declaratory judgment action.

{¶ 30} That the probate court had the jurisdiction to consider both documents is clear. A probate court has jurisdiction to render declaratory judgments concerning any question pertaining directly to the administration of an estate. See *Sexton v. Estate of Bobinchuck* (Apr. 3, 1975), 8th Dist. Nos. 33321 and 33593, 1975 WL 182352. Specifically, R.C. 2101.24 provides that the probate court has jurisdiction to "direct and control the conduct and settle the accounts of executors and administrators and order the distribution of estates" and to render declaratory judgments. This section also provides that the probate court has "plenary power at law and in equity to dispose fully of any matter that is properly before the court, unless the power is expressly otherwise limited or denied by a section of the Revised Code." R.C. 2101.24(C). A review of applicable case law leaves no doubt that a probate court has jurisdiction in an action for declaratory judgment to determine a widow's right to share in her husband's estate—not just under the terms of a trust instrument, but also under the terms of a prenuptial agreement. See *Solomon v. Main* (Feb. 19, 1985), 5th Dist. No. 84–CA–12, 1985 WL 7191; see, also, *Diemer v. Diemer* (1994), 99 Ohio App.3d 54, 649 N.E.2d 1285. Accordingly, we conclude that the probate court in this case properly considered both the trust document and the antenuptial agreement in determining this declaratory judgment action.

{¶ 31} We begin our analysis of the various assignments of error with an examination of Marianne's first assignment of error, in which she argues that the trial court erred when it ruled that the marital trust A must be reduced by estate taxes. On the issue of taxation, the trust document provides as follows:

{¶ 32} "If Grantor's Spouse survives Grantor, Trustee shall allocate to and hold in a separate trust (Trust A) for the sole use and benefit of Grantor's Spouse, an amount, *after the payment of all estate, inheritance, legacy or succession taxes assessable by reason of Grantor's death* ; equal in value to one-third (1/3) of the value of Grantor's Adjusted Gross Estate, as defined in Section 6166 of the Internal Revenue Code of 1886, as thereafter may be amended ("Code"), minus (1) the net federal estate tax value of Grantor's primary residence and all tangible personal property bequeathed to Grantor's Spouse under Grantor's Last Will and Testament, (2) the value of the motor vehicle or the funds distributed to purchase the motor vehicle pursuant to Article 4, Section 4 of this trust and (3) the amount of any indebtedness satisfied by this trust pursuant to Article 4, Section 5 of this trust, *after the payment of all estate, inheritance, legacy or succession taxes assessable by reason of Grantor's death* ; provided, any tax imposed by Chapter 13 of the Code shall be charged to the property causing the tax in the manner provided by applicable law." (Emphasis added.)

{¶ 33} The Ballas children construe this provision to mean that the marital trust A is funded "after the payment of all estate, inheritance, legacy or succession taxes" and therefore bears its share of taxes. Marianne, on the other hand, construes the provision to mean that the marital trust A should be funded in an amount equal in value to one-third of George's adjusted gross estate *before* the payment of taxes. Under Marianne's interpretation, the Ballas children would pay all of the estate taxes.

{¶ 34} When interpreting a trust instrument, it is presumed that words are to be used according to their common, ordinary meaning. *In re Trust of Brooke* (1998), 82 Ohio St.3d 553, 557, 697 N.E.2d 191. Here, the funding formula set forth at Article 4, Section 6 of the trust and, in particular, the phrase "after the payment of all estate, inheritance, legacy or succession taxes," is clear, plain, and unambiguous. Pursuant to that formula, the trustee should pay the estate taxes and then should allocate one-third of the remaining assets (less the listed deductions) to the marital trust A for Marianne's benefit during her lifetime.

{¶ 35} Marianne's interpretation requires that the phrase "after the payment of all estate, inheritance, legacy or succession taxes" be construed as describing the timing of the distribution to trust A, rather than as determining the amount of the marital trust or allocating taxes. Upon reading the subject phrase within the context of the entire provision dealing with the payment of taxes and the funding of Marianne's marital trust, we are unpersuaded by Marianne's clearly strained interpretation, and we decline to find either that it is reflective of George's actual intent or that it is indicative of any ambiguity in the trust terminology.

{¶ 36} We note that language contained in the antenuptial agreement mirrors the language set forth at Article 4, Section 6 of the trust. In addition, the prenuptial agreement specifically provides that "[t]he parties recognize that, due to the apportionment of taxes and other factors, the formula provided herein may place Marianne in a less favorable position than she would otherwise be in as a surviving spouse if this Agreement did not exist and if the probate estate of George contained all assets includable in his gross estate for federal estate tax purposes." All of this evidence weighs strongly in favor of the Ballas children's interpretation.

{¶ 37} Unfortunately for the Ballas children, the trust agreement contains an additional provision, at Article 4, Section 7, paragraph 7.1, that creates a serious ambiguity that cannot be reconciled simply by looking to the four corners of the trust document. Article 4, Section 7 establishes the children's trust B. Paragraph 7.1 provides:

{¶ 38} "Trustee may, but shall not be compelled to, pay or advance to the executor, personal representative, or administrator of Grantor's estate sufficient funds to pay, or Trustee may directly pay, all or any part of the debts and obligations of Grantor, * * * and any estate, inheritance, succession, or other death taxes, including any interest and penalties, assessed by any jurisdiction against Grantor's estate or payable by reason of Grantor's death with respect to any property included in Grantor's estate for death tax purposes, whether or not such property or interest passes under Grantor's Will, this Agreement, or otherwise, or is assessed against any recipient thereof."

{¶ 39} Under this provision, the trustee has the discretion to allocate all of the estate taxes to the children's trust B. Because this provision authorizes an allocation of taxes that conflicts both with the provision set forth at Article 4, Section 6 and with the provisions of the antenuptial agreement, we are forced to conclude that the language of the trust document is ambiguous. Accordingly, any extrinsic evidence is appropriately considered to ascertain George's intent. See *McDonald & Co. Secs., Inc., Gradison Div.*, 140 Ohio App.3d at 363, 747 N.E.2d 843.

{¶ 40} In this case, both parties have pointed to at least some extrinsic evidence in support of their individual positions. Although it would appear from the record that the extrinsic evidence presented by the Ballas children over-whelmingly demonstrates that George's intent was, in fact, to allocate taxes to the marital trust A, such determinations are generally not to be made on summary judgment—and particularly not by an appellate court.[1] Because there remains a genuine issue of material fact, Marianne's first assignment of error is well taken.

{¶ 41} Next, we examine the Ballas children's first assignment of error, in which they assert that the trial court erred in declaring that the funding formula for the marital trust A requires the trustee to deduct only one-half of the value of the grantor's primary residence.

{¶ 42} Pursuant to Article 4, Section 6 of the trust, the value of the marital trust is reduced by, among other things, "the net federal estate tax value of Grantor's primary residence and all tangible personal property bequeathed to Grantor's Spouse under Grantor's Last Will and Testament." The question for our determination is whether the phrase "net federal estate tax value" requires that the full value, or only one-half of the value, of the Ballas residence be deducted from Marianne's share. The phrase is not defined in the trust; nor

---

1. In the unlikely event that the trial court, upon considering all admissible extrinsic evidence, is unable to determine that George's clear intent was to shift the tax burdens imposed by the Ohio apportionment statute, as set forth at R.C. 2113.86, the apportionment statute will apply. See *Matthews v. Swallen* (Oct. 25, 1995), 1st Dist. No. C–940443, 1995 WL 621305.

does it have a common, ordinary meaning. Thus, we are compelled to look to extrinsic evidence for guidance in determining this matter. See *McDonald & Co. Secs., Inc., Gradison Div.*, 140 Ohio App.3d at 363, 747 N.E.2d 843. As pointed out by both Marianne and the Ballas children, federal estate-tax legislation, while failing to provide a precise definition of the phrase, is at least instructive.

{¶ 43} The Ballas children rely on a general reading of Internal Revenue Code Section 2031, which provides that the value of the *gross* estate of the decedent shall include the value of *all* property. Next, they look to the estate-tax return for George's estate, which lists the value of the residence as $2,150,000.[2] Without addressing the significance of the term "net" as set forth in the trust language, the Ballas children conclude that the entire value of the residence—as listed in the tax return—should be deducted from Marianne's share.

{¶ 44} Marianne urges a more detailed—and, ultimately, a more persuasive— analysis. Under Marianne's theory, in order to discover the meaning of the phrase "net federal estate tax value," we must begin with an examination of Internal Revenue Code Sections 2040(a) and (b). Together, those provisions define the "federal estate tax value" of George's primary residence as *one-half of the full value of the residence.*

{¶ 45} To determine the meaning of "net federal estate tax value," as used in the trust instrument, we first look to Internal Revenue Code Section 2051, which provides that "the *value of the taxable estate* shall be determined by *deducting from the value of the gross estate* the deductions provided for in this part." (Emphasis added.) Next, we consider Internal Revenue Code Sections 2056(a) and (b). Internal Revenue Code Section 2056(a) provides:

{¶ 46} "(a) [T]he value of the taxable estate shall, except as limited by subsection (b), be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate."

{¶ 47} Pursuant to Internal Revenue Code Section 2056(b)(4), in determining the value of any encumbered interest in property passing to the surviving spouse for which a marital deduction is allowed, "such encumbrance or obligation shall be taken into account in the same manner as if the amount of a gift to such spouse of such interest were being determined." Treas.Reg. Section 20.2056(b)–4(b) addi-

---

**2.** Although both parties seem to agree that the residence is valued at $2,184,249.93, review of the estate tax return reveals that the $2,184,249.93 figure represents the whole of George and Marianne's jointly owned property, including, in addition to the residence, some miscellaneous personal property and funds contained in a bank checking account. The residence, by itself, is valued at $2,150,000.

tionally provides that the value of that interest "is to be reduced by the amount of the mortgage, other encumbrance, or obligation."

{¶ 48} After reviewing Internal Revenue Code Sections 2031, 2040, 2051, and 2056, we conclude that the meaning of "net federal estate tax value" in Article 4, Section 6 of the trust is clear: it is one-half of the full value of the Ballas marital residence, less one-half of all encumbrances on the property. The trial court's ruling on this issue was correct. Accordingly, the Ballas children's first assignment of error is not well taken.

{¶ 49} We continue with an examination of Marianne's second assignment of error and the Ballas children's second assignment of error. Both challenge the trial court's determination that the trustee *may, but is not required to*, consider other sources of income before making payments of principal.

{¶ 50} Article 4, Section 6.1 provides without qualification that Marianne will receive as an outright gift "all income" generated by the marital trust. Article 4, Section 6.2, which deals with distribution of marital trust principal, does not so unequivocally provide. Rather, pursuant to that section, "Trustee may pay to or apply for the benefit of Grantor's Spouse such amounts of principal as Trustee deems necessary, advisable, or expedient for the health, education, support, or maintenance of Grantor's spouse." Thus, the trust language vests the trustee with the discretion to determine the amount to be distributed to Marianne. But it fails to address the specific question whether the trustee, in exercising that discretion, can consider other evidence of Marianne's financial resources.

{¶ 51} Turning to the terms of the antenuptial agreement, we find language that mirrors the trust language, but, in addition, directly addresses the matter at hand. This language provides that "[d]uring Marianne's life, she shall be entitled to all income of the trust, at least annually, and such amounts of principal as the Trustee deems necessary, advisable or expedient for Marianne's health, education, support or maintenance, *not taking into consideration the other income and resources available to Marianne*." Thus, the antenuptial agreement expressly provides that the trustee is not to consider Marianne's other financial resources when making distributions to her.

{¶ 52} The Ballas children look to the more general terms of the trust instrument in support of their argument that as a matter of practical and logical necessity, the trustee must take into consideration Marianne's financial resources before he can reasonably make a determination as to a principal distribution amount that would be "necessary, advisable, or expedient." Marianne, on the other hand, relies on the more specific terms of the antenuptial agreement in support of her argument that the trustee is actually prohibited from taking into consideration any of her income and assets when making distributions to her.

{¶ 53} Construing the two documents together, as we should in this case, we find that the specific terms of the antenuptial agreement control, leading us to the conclusion that George intended the trustee to distribute principal payments to Marianne without taking into consideration any other income or resources available to her. Although such a scheme might appear somewhat illogical—after all, it is fair to ask, as the Ballas children do, how one can possibly make a determination of financial need without knowing the state of the beneficiary's finances—that was not only what George intended, but it is also the general rule of construction in Ohio. As stated by the Fourth District Court of Appeals in *Leyshon v. Miller* (Oct. 20, 1994), 4th Dist. No. 93CA37, 1994 WL 585743, in a case in which "the settlor directs the trustee to pay whatever is necessary for the support and maintenance of the beneficiary, it will be presumed that the settlor intended the beneficiary to be supported and maintained from the trust estate, regardless of other income."

{¶ 54} Because we find that the trial court erred to the extent that its ruling allows for, rather than prohibits, the trustee to consider other sources of income before making payments of principal, Marianne's second assignment of error is well taken. For the same reason, the Ballas children's second assignment of error is not well taken.

{¶ 55} Finally, we consider Marianne's third assignment of error and the Ballas children's third assignment of error. Because both dispute the trial court's determination that the trustee is required under the terms of the antenuptial agreement to allocate 60 percent of the marital trust assets to fixed-income securities, the two assignments of error will be considered together in this analysis. Marianne argues that the trial court erred in this determination because it misconstrued the express terms of the antenuptial agreement. The Ballas children attack the determination on the grounds that it enforces a provision that appears only in the antenuptial agreement and not in the trust document.

{¶ 56} The pertinent portion of the antenuptial agreement states, "During the lifetime of Marianne, the Trustee shall, upon the written direction of Marianne, invest no less than 60% of the trust property in fixed income securities (or other assets or securities whose total investment returns consist of all or substantially all of fiduciary accounting income, as defined under applicable State law, as opposed to capital appreciation), which fixed income securities produce either taxable or federally tax exempt income and are suitable trust investments, as determined from time to time by the Trustee."

{¶ 57} Trustee National City Bank petitioned the court as follows with respect to this provision: "Clarification is needed to determine *if the spouse does or does not possess the power* under the Trust to require the Trustee to invest *no less*

*than 60%* of the Trust property in fixed income securities (or other assets or securities whose total investment returns consist of all or substantially all of fiduciary accounting income, as defined under applicable State law, as opposed to capital appreciation), which fixed income securities produce either taxable or federally tax exempt income and are suitable trust investments, as determined from time to time by the Trustee." (Emphasis added.)

{¶ 58} Rather than answering this question, which required only a yes or no answer, the trial court fashioned a ruling that stated that *the trustee was required* under the terms of the antenuptial agreement *to allocate 60 percent* of the marital trust assets to fixed-income securities. This ruling was in direct contravention of the language of the antenuptial agreement and therefore was clearly in error. Under the express terms of the antenuptial agreement, only Marianne has the right, at her option, to direct an allocation of no less than 60 percent.

{¶ 59} Addressing the Ballas children's argument that the provision must fail because it does not appear in the trust document, we reiterate that the antenuptial agreement is properly considered in establishing the distribution and handling of assets in this case. In addition, the trust document is silent as to the percentage of trust property that Marianne may direct the trustee to invest in fixed-income securities. In this regard, the antenuptial agreement provision merely adds to, and in no way conflicts with, the trust document's terms.[3] For all of the foregoing reasons, Marianne's third assignment of error is well taken, and the Ballas children's third assignment of error is not well taken.

{¶ 60} The judgment of the Lucas County Court of Common Pleas, Probate Division, is affirmed in part and reversed in part. This matter is remanded to the trial court for further proceedings consistent with this decision. Appellees and cross-appellants are ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, the fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.

Judgment affirmed in part
and reversed in part,
and cause remanded.

HANDWORK and PIETRYKOWSKI, JJ., concur.

---

3. The only language in the trust document that concerns Marianne's ability to invest trust property provides that "Grantor's Spouse shall have the power to convert, within a reasonable time, any non-income producing property to income-producing property."

GEORGE M. GLASSER, J., retired, of the Sixth Appellate District, sitting by assignment.