[Cite as *Harter v. Chillicothe Long-Term Care, Inc.*, 2012-Ohio-2464.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| SUSAN L. HARTER, et al., | : | |
| | : | |
| Plaintiffs-Appellants, | : | Case No. 11CA3277 |
| | : | |
| vs. | : | |
| | : | **Released: May 29, 2012** |
| CHILLICOTHE LONG-TERM CARE, | : | |
| INC., et al., | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| Defendants-Appellees. | : | |

APPEARANCES:

James R. Kingsley, Kingsley Law Office, Circleville, Ohio, for Appellants.

Anthony J. Caruso and Rebecca L. Cull, Kohnen & Patton LLP, Cincinnati, Ohio, for Appellees.

McFarland, J.:

{¶1} Appellants appeal the decision of the Ross County Court of Common Pleas granting summary judgment in Appellees' favor. Specifically, Appellants argue the trial court erred by finding for Appellees on the claims of sexual harassment from a hostile work environment and intentional infliction of emotional distress. Having reviewed the record, we find the alleged harassment was not severe and pervasive. Nor did Appellants demonstrate they suffered severe emotional distress. Accordingly, the trial court correctly entered summary judgment on these claims in Appellees' favor and we affirm its judgment.

FACTS

{¶2} Nursing Care Management Group ("NCMG") owned Chillicothe Long-Term Care, Inc., which did business as Westmoreland Place ("Westmoreland"), which was a nursing home facility. David Dixon ("Dixon") was the administrator for Westmoreland. During Dixon's tenure Westmoreland hired Appellants Susan Harter ("Harter"), Pamela Mullins ("Mullins"), and Diana French ("French").

{¶3} Throughout Appellants' employ, they heard Dixon, either directly or indirectly through hearsay and rumors, make comments they believed were inappropriate and personally offensive. Appellants allege, in the aggregate:

- Dixon referred to an employee as "hot";

- Dixon referred to an employee as a "fat bitch";

- Dixon referred to a male employee as a "faggot";

- Dixon discussed the television show Dr. 90210, which focuses on a plastic surgeon who routinely performs breast augmentations, and Dixon wished he was that surgeon;

- Dixon and others discussed sexual encounters with their spouses;

- Dixon discussed breast feeding;

- Dixon spoke of dating a girl in high school who was "easy";

- Dixon enjoyed hearing about a female resident's disfigured genitalia;

- Dixon recounted a story where a female stripper placed her crotch in his face;

- Dixon discussed his wife giving him fellatio on specific days of the year;

- Dixon believed prostitution should be legal;

- Dixon referred to an employee as "eye candy";

- Dixon enjoyed hearing a story about a female employee "messing around" with her husband on the way to or from church;

- Dixon stated women use sex to control men;

- Dixon discussed an employee's thong underwear;

- Dixon watched women walk down the hallway;

- Dixon commented on an employee's breasts after she leaned over his desk;

- Dixon asked Harter whether she was having an affair with a co-worker;

- Dixon stated breast cancer was not a problem, but an opportunity for women to receive breast augmentation;

- Dixon had inquired about an employee's breast tattoo;

- When confronted with a rumor that Dixon was having an affair with an employee, Dixon stated he would be proud to have done so.

Dixon denied having made many of the comments, admitted to having made some of the comments, and disputed the context and Appellants' portrayal of others.

{¶4} In addition to the comments Dixon allegedly made, Appellants took issue with Dixon's alleged fondness for Megan Cline ("Cline"), an employee Dixon hired to market Westmoreland and obtain new clients. Cline was admittedly younger than Appellants and many other staff members, and by all accounts was attractive. Although Cline had a bachelor's degree and Appellants only had a high school education, they were upset Cline received a higher wage. Although Cline was hired to market the facility to potential residents, Appellants were upset Cline received an office and new furniture and they believed Cline received preferential treatment because of her appearance, not her position.

{¶5} At no point in time did Appellants complain about any of Dixon's behavior. Even when participating in a conversation where an inappropriate comment allegedly occurred, Appellants did not make it known they were offended or such a comment was unwelcome. Even though the corporate compliance manual issued by NCMG contained a grievance procedure, which included a mechanism to bypass an offending supervisor and report inappropriate conduct anonymously and confidentially, Appellants never once complained or used the bypass mechanism.

{¶6} Eventually Appellants left Westmoreland's employ.  After their separation, Appellants met with counsel and filed a complaint alleging 1) sexual harassment from a hostile work environment; 2) age discrimination; 3) breach of employment contract/promissory estoppel; 4) intentional infliction of emotional distress; 5) defamation/slander; and 6) ratification.  Appellees filed a motion for summary judgment, which the trial court granted in its entirety.

{¶7} The trial court found there were no genuine issues of material fact and Appellees were entitled to judgment as matter of law.  The court found the comments Dixon allegedly made were not severe or pervasive enough to affect the terms and conditions of Appellants' employment.  The courts also found many of the alleged comments, while rude and offensive, were not made because of Appellants' sex and thus were not discriminatory.

{¶8} Appellants' age discrimination claims were time-barred.  Regarding promissory estoppel, Appellants failed to demonstrate a clear an unambiguous promise of continued employment or any detrimental reliance thereon.

{¶9} On the claim for intentional infliction of emotional distress, the court found the alleged conduct as not extreme and outrageous as a matter of law and Dixon did not intend to cause serious emotional distress by his crude comments.  Turning to defamation, Harter and Mullins' claims were time-barred.  While the

court did not find French's claim was time-barred, it held that she failed to present evidence of a false statement by Dixon, which was fatal to her claim.

{¶10} As Appellants did not respond to Appellee's motion on the claim of ratification, the court found for Appellees on that claim. Finally, the court found punitive damages were inappropriate since it had entered judgment for Appellees on all claims.

{¶11} Appellants now appeal the trial court's entry of summary judgment, though only with respect to their claims of a hostile work environment and intentional infliction of emotional distress.

ASSIGNMENTS OF ERROR

I. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT GRANTED DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DENYING PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIM?

II. DID THE TRIAL COURT COMMIT PREJUDICIAL ERROR WHEN IT DISMISSED THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM?

Standard of Review

{¶12} "Appellate courts review summary judgments de novo." *Wells Fargo v. Phillabaum*, 4th Dist. No. 10CA10, 2011-Ohio-1311, at ¶ 7, citing *Broadnax v. Greene Credit Service*, 118 Ohio App.3d 881, 887, 694 N.E.2d 167 (2d Dist. 1997)

and *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41, 654 N.E.2d 1327 (9th Dist. 1995). "In other words, we afford no deference whatsoever to a trial court's decision, and, instead, conduct our own independent review to determine if summary judgment is appropriate." *Wells Fargo* at ¶ 7, citing *Woods v. Dutta*, 119 Ohio App.3d 228, 233-234, 695 N.E.2d 18 (4th Dist. 1997) and *Phillips v. Rayburn*, 113 Ohio App.3d 374, 377, 680 N.E.2d 1279 (4th Dist. 1996).

{¶13} "Summary judgment is appropriate only when (1) there is no genuine issue of material fact, (2) reasonable minds can come to but one conclusion when viewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party, and (3) the moving party is entitled to judgment as a matter of law." *Greene v. Seal Twp. Bd. of Trustees*, 4th Dist. No. 10CA812, 2011-Ohio-1392, at ¶9, citing *Doe v. Shaffer,* 90 Ohio St.3d 388, 390, 738 N.E.2d 1243 (2000), *Bostic v. Connor*, 37 Ohio St.3d 144, 146, 524 N.E.2d 881 (1988), and Civ.R. 56(C).

{¶14} "The party moving for summary judgment has the initial burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Greene* at ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). "The moving party must inform the trial court of the basis of the motion and must identify those portions of the record that demonstrate the absence of a material fact." *Id*., citing *Dresher* at 293. When

seeking to have the nonmoving party's claims dismissed, "the moving party must specifically refer to the 'pleadings, depositions, answers to interrogatories, * * * written stipulations of fact, if any,' that affirmatively demonstrate that the nonmoving party has no evidence to support [its] claims." *Id.*, citing *Dresher* and Civ.R. 56(C). "If the moving party satisfies its initial burden, the nonmoving party then has the reciprocal burden outlined in Civ. R. 56(E) to set forth specific facts showing that there is a genuine issue for trial. If the nonmovant does not satisfy this evidentiary burden and the movant is entitled to judgment as a matter of law, the court should enter a summary judgment accordingly." *Id.*, citing *Kulch v. Structural Fibers, Inc.*, 78 Ohio St.3d 134, 145, 677 N.E.2d 308 (1997), citing *Dresher* at 295. "Mere speculation and unsupported conclusory assertions are not sufficient." *Hansen v. Wal-Mart Stores, Inc.*, 4th Dist. No. 07CA2990, 2008-Ohio-2477, at ¶ 8, citing *Boulton v. Vadakin,* 4th Dist. No. 07CA26, 2008-Ohio-666, at ¶ 20.

### I. Sexual Harassment, Hostile Work Environment

{¶15} In their first assignment of error, Appellants claim the trial court erred when it entered summary judgment in Appellees' favor on the claim of sexual harassment from a hostile work environment. We disagree.

### A. Legal Analysis

{¶16} R.C. 4112.02(A) prohibits discrimination in the workplace based upon a person's sex. The Supreme Court of Ohio has determined federal case law interpreting Title VII of the Civil Rights Act of 1964 is generally applicable to cases involving alleged violations of R.C. Chapter 4112. *Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 175, 729 N.E.2d 726 (2000). Like the federal system, the Supreme Court held that a person may prove sexual harassment by demonstrating a hostile environment, that is "harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." *Hampel* at 176.

> In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hampel* at 176-177.

{¶17} Regarding the second element, "[h]arassment 'because of sex' is the sine qua non for any sexual harassment case." *Id.* at 178. This refers to both harassment because of the victim's gender and harassment associated with "libidinal gratification." However, "harassment is not automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 180. "Oftentimes, the use of certain vulgar expressions 'has no connection with the sexual acts to which they may reference * * * [and] they are simply expressions of [personal] animosity or juvenile provocation,' rather than discrimination based on sex. Thus, [a]lthough explicit sexual content or vulgarity may often take a factfinder a long way toward concluding that harassing comments were in fact based on gender, * * * this need not necessarily be the case." (Citation omitted.) *Id.*

{¶18} To be actionable, the harassment must be harassment that would not have occurred but for the sex of the employee. *Edwards v. Dubruiel*, 2d Dist. No. 2002-CA-50, 2002-Ohio-7093, at ¶ 19. "[N]o matter how severe or pervasive the conduct, harassment does not constitute a discriminatory practice under R.C. 4112.02(A) unless based on a prohibited classification." *Hampel* 89 Ohio St.3d at 184-185, 729 N.E.2d 726. For example, harassing and crude conduct that was directed toward employees as a whole, including both genders, was not based upon sex and was not actionable. See *Godsey-Marshall v. Phillipsburg*, 2d Dist. No.

23687, 2010-Ohio-2266, at ¶ 13-15 (holding "the harassment was based on something other than sex.").

{¶19} Likewise, the issue of whether the alleged harassment was severe or pervasive is fact-specific. The issue of "'whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Hampel*, 89 Ohio St.3d at 180, 729 N.E.2d 726, quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The Supreme Court of the United States explained "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (Internal citation omitted.) *Faragher v. Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' * * * Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id*. Moreover, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id*. See, also,

*Ridley v. Federal Express*, 8th Dist. No. 82904, 2004-Ohio-2543, at ¶ 70; *Jarvis v. Gertenslager*, 9th Dist. Nos. 02CA0047, 02CA0048, 2003-Ohio-3165, at ¶ 39-43.

i. French

{¶20} Regarding the alleged hostile work environment, French alleged she heard Dixon comment that one employee was "hot," another was a "fat bitch," and a male employee was a "faggot." French also heard Dixon and other employees discuss a television show and breasts, as well as sexual encounters with their respective spouses.

{¶21} Here, viewing the evidence in a light most favorable to Appellants and accepting French's allegations as true, she failed to demonstrate the comments were "sufficiently severe or pervasive" to affect French's employment. French was employed by Westmoreland for nearly fifteen months (April 12, 2008 to July 8, 2009) and she was only able to recall these five instances of behavior she believed were inappropriate, making the frequency of the comments very low. The comments were also not severe; the first three were offhand comments about persons' appearances and the latter two were employees engaging in consensual and welcome discussions of a sexual nature. None of the incidences were physically threatening or humiliating to the participants and there was no suggestion that any of the comments interfered with French's work performance.

Thus, the alleged harassment was not severe or pervasive enough to create a hostile or abusive work environment and French's claim fails.

### ii. Mullins

{¶22} Mullins recalled more incidences of Dixon's allegedly inappropriate behavior, though much of it was secondhand. Mullins heard Dixon discussing breast milk during a lunch conversation with employees. She also heard Dixon speak of dating a girl in high school because she was "easy." Mullins had heard from other staff members that Dixon enjoyed hearing about a female resident's disfigured genitalia; Dixon wanted to be the main character of Dr. 90210 so he could touch women's breasts; Dixon had told a story of a female stripper placing her crotch in his face; Dixon had discussed his wife giving him fellatio on certain dates; Dixon believed prostitution should be legal; Dixon had referred to Cline as "eye candy"; and Dixon enjoyed hearing a story from an employee about "messing around" with her husband on the way to church.

{¶23} Here, like French, Mullins has failed to demonstrate that the alleged incidences were extreme and severe or pervasive enough to create an abusive or hostile environment and affect the conditions of her employment. Viewing the evidence in a light most favorable to Appellants and accepting Mullins' version of events as true, there were only nine incidences Mullins recalled in the 18 months (January 19, 2007 to July 23, 2008) she worked at Westmoreland, making their

frequency low. Though distasteful, none of the comments or conversations was severe. None was physically threatening or humiliating to Mullins. Finally, none of the comments unreasonably interfered with Mullins' work performance. Thus, the alleged harassment was not severe or pervasive enough to create a hostile or abusive work environment and Mullins' claim fails.

### iii. Harter

{¶24} Harter's recollection of events was, by far, the most detailed of the three appellants. Harter recalled hearing Dixon state, in her presence: prostitution should be legal; his wife gave him fellatio on certain dates; women used sex to control men; he wanted to be Dr. 90210 in order to touch women's breasts; Cline was "eye candy"; he commented on Jennifer Colbert's thong underwear; he leered at women walking down the hallway; he commented on an employee's breasts after she left the office; and he questioned Harter about whether she was having an affair with a maintenance worker. Harter also recalled several comments other staff members had attributed to Dixon and relayed to her: Dixon had told the story about a stripper placing her crotch in his face; Dixon believed breast cancer was not a problem, but an opportunity for women to get breast augmentation; Dixon had inquired about a female's employee's breast tattoo; and when it was implied Dixon was having an affair with Cline, Dixon stated he would be proud to be linked to such a rumor.

{¶25} Here, Dixon's comments were neither severe nor pervasive. Viewing the evidence in a light most favorable to Appellants and assuming Harter's portrayal of events is accurate, this equates to 13 comments over the nearly seven-and-a-half years Harter worked at Westmoreland (December 11, 2000 to July 2, 2008). Some of the comments occurred in 2000, 2004, and 2006, while others occurred in 2007 and 2008. Their frequency was very low.[1] None of the comments were severe, with the exception of the one regarding breast cancer.

{¶26} Likewise, none of the incidences were humiliating to Harter, nor were they physically threatening. Most all of the comments can be categorized as offensive utterances or lewd conversations with employees. Finally, Harter failed to demonstrate that Dixon's comments unreasonably interfered with her work performance. Thus, the alleged harassment was not severe or pervasive enough to create a hostile or abusive work environment and Harter's claim fails.

{¶27} To be clear, Dixon did dispute that he made many of the comments Appellants attributed to him. Yet viewing the evidence in a light most favorable to Appellants and assuming their versions of events are true, their claims still fail as a matter of law because they did not submit evidence of alleged harassment that was

---

[1] Though Appellants' brief explicitly and implicitly characterizes Dixon's comments as "repeated," the evidence demonstrates otherwise. When Appellants responded in their depositions as to when specific comments occurred, they gave specific and finite dates. They did not state such comments occurred daily or with regular frequency.

severe and pervasive to the point of altering the conditions of their work and creating an abusive or hostile environment.

{¶28} Additionally, many of the comments Dixon allegedly made were not based upon sex. That is, they were crude and many would find them offensive, but they would have occurred regardless of the gender of persons around him. While the comments were sexually explicit and vulgar, they were offensive utterances, not discriminatory harassment specifically directed at women. R.C. Chapter 4112 is not a "general civility code" and this is not the type of conduct it is intended to prohibit. Appellees were entitled to judgment as matter of law on Appellants' claims of sexual harassment from a hostile work environment.

{¶29} Accordingly, we overrule Appellants' first assignment of error.

II. Intentional Infliction of Emotional Distress

In their second assignment or error, Appellants argue the trial court erred when it entered summary judgment in Appellee's favor on Appellants' claims for intentional infliction of emotional distress. Appellants simply argue a claim for intentional infliction of emotional distress can be premised upon sexual harassment. Appellees counter that Appellants failed to prove nearly every element necessary to establish a claim for intentional infliction of emotional distress. We agree with Appellees.

## A. Legal Analysis

{¶30} To establish a claim for intentional infliction of emotional distress, a party must show:

(1) that the defendant either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress; (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it would be considered utterly intolerable in a civilized community; (3) that the defendant's actions were the proximate cause of plaintiff's psychic injury; and (4) that the mental distress suffered by plaintiff is serious and of such a nature that no reasonable person could be expected to endure it.  "[I]n order to state a claim alleging the intentional infliction of emotional distress, the emotional distress alleged must be serious." "[S]erious emotional distress" is "emotional injury which is both severe and debilitating." "[S]erious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." (Citations omitted).  *Smith v. Redecker*, 4th Dist. No. 08CA33, 2010-Ohio-505, at ¶ 60.

{¶31} While sexual harassment in the workplace may form the basis of a claim for intentional infliction of emotional distress, *Johnson v. Cox*, 4th Dist. No. 96CA622, 1997 WL 152636, *4 (Mar. 28, 1997), this does not negate Appellants' burden of proving the elements of intentional infliction of emotional distress.

{¶32} Here, Appellants' claim fails for two reasons. First, because Appellants couched their claims for intentional infliction of emotional distress as arising from the alleged sexual harassment, which failed as a matter of law, their claims for intentional infliction of emotional distress necessarily fail, too. Without demonstrating the sexual harassment, Appellants failed to show any extreme and outrageous conduct.

{¶33} Second, Appellants failed to prove any of them suffered serious emotional harm. French had not seen a psychologist or therapist for any emotional distress related to Westmoreland. (French Depo. at 20.) Nor had Mullins (Mullins Depo. at 125.) or Harter (Harter Depo. at 186.). Appellants offered no evidence regarding the seriousness of their alleged emotional distress. None of them claimed their emotional distress was severe or debilitating or that a reasonable person, normally constituted, would be unable to cope adequately with it.

{¶34} Thus, Appellants claims for intentional infliction of emotional distress fail and Appellees were entitled to judgment as a matter of law on these claims. As

such, we overrule Appellants' second assignment of error.  Having overruled all of

Appellant's assignments of error we affirm the judgment of the trial court.

**JUDGMENT AFFIRMED**.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and that the Appellees recover of Appellants costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.

Abele, P.J.: Concurs in Judgment and Opinion.
Harsha, J.: Concurs in Judgment Only.

For the Court,

BY: _____
Matthew W. McFarland, Judge

### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**